ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
Email: andrew@packardlawoffices.com
        wncarlon@packardlawoffices.com

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER,<br><br>Plaintiff,<br>vs.<br><br>ALTAIR PARAMOUNT, LLC,<br><br>Defendant. | Case No. 2:23-cv-05585-GW-PD<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387)** |

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act," "CWA," or "Act") against AltAir Paramount, LLC ("Defendant").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

1    Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A)

2    (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to

3    33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28

4    U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further

5    necessary relief based on such a declaration).

6         2.        On or about May 8, 2023, Plaintiff provided written notice to Defendant, via certified

7    mail, of Defendant's violations of the Act ("CWA Notice Letter"), and of their intention to file suit

8    against Defendant, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1)

9    (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States

10   Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive

11   Director of the State Water Resources Control Board ("State Board"), pursuant to 40 C.F.R.

12   § 135.2(a)(1) (1991).  A true and correct copy of LA Waterkeeper's CWA Notice Letter is attached

13   hereto as **Exhibit 1**, and is incorporated by reference.

14        3.        More than sixty days have passed since Plaintiff served this CWA Notice Letter on

15   Defendant and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither

16   the EPA nor the State of California has commenced or is diligently prosecuting a court action to

17   redress the violations alleged in this Complaint.  This action's claims for civil penalties are not

18   barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

19        4.        Venue is proper in the Central District of California pursuant to Section 505(c)(1) of

20   the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.

21   Intra-district venue is proper in Los Angeles, California, because the sources of the violations are

22   located within Los Angeles County, California.

23   **II.    <u>INTRODUCTION</u>**

24        5.        This Complaint seeks relief for Defendant's violations of the CWA at the

25   approximately 15-acre facility owned and/or operated by Defendant ("Facility").  The Facility is

26   located at 14700 Downey Avenue, Paramount, California 90723.

27        6.        Defendant discharges pollutant-contaminated storm water from the Facility into

28   municipal storm drains that discharge to Los Cerritos Channel, which drains to Alamitos Bay, then

San Pedro Bay, and ultimately to the Pacific Ocean (collectively the "Impacted Waters").

7.      The Impacted Waters are waters of the United States.

8.      Defendant is violating both the substantive and procedural requirements of the CWA.

9.      Defendant's discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 14-57-DWQ as amended by Order 2015-0122-DWQ & Order 20XX-XXXX-DWQ ("General Permit" or "Permit").

10.     Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

11.     The failure on the part of industrial facility operators such as Defendant to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Impacted Waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  *See e.g.,* Bay, S., *Study of the Impact of Stormwater Discharge on Santa Monica Bay* (Nov. 1999).

12.     Numerous scientific studies in recent decades have documented serious health risks to recreational users of southern California's waters from pollutant-loaded storm water discharges. *See e.g.*, Stenstrom, M. K., *Southern California Environmental Report Card: Stormwater Impact* at 15; Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999- 2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* (Santa Monica Bay Restoration Project, 1996) at 5.

13.     A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles*

*County Beaches* (1999-2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* at 5.

14.    Los Angeles' waterways are ecologically sensitive areas, and are essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

15.    Los Angeles' waterways provide numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

16.    Los Angeles' waterways also provide non-contact recreation and aesthetic opportunities, such as hiking, running, biking, and wildlife observation.

17.    Industrial facilities, like Defendant's, that discharge storm water contaminated with sediment, heavy metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits Los Angeles' waterways have for locals and visitors alike.

18.    Pursuant to the Clean Water Act Section 303(d) list of impaired waterbodies, Los Cerritos Channel is listed for the following water quality impairments: ammonia, bis(2ethylhexyl)phthalate (DEHP), chlordane (sediment), copper, indicator bacteria, lead, pH, trash, and zinc.

19.    Alamitos Bay is listed as impaired for indicator bacteria and dissolved oxygen.

20.    San Pedro Bay is listed as impaired for dichlorodiphenyltrichloroethane, polychlorinated biphenyls, and toxicity.

21.    Controlling polluted storm water discharges associated with industrial activity is essential to protecting southern California's surface and coastal waters and essential to LA Waterkeeper's mission.

**III.    PARTIES**

22.    LA Waterkeeper is a non-profit public benefit corporation organized under the laws of California.

23.    LA Waterkeeper's main office is located at 360 E 2nd Street, Suite 250, Los Angeles, CA 90012.

24.    Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection and

1    defense of the inland and coastal surface and ground waters of Los Angeles County including the

2    Los Angeles River.

3           25.    The organization works to achieve this goal through education, outreach, advocacy

4    and, where necessary, litigation and enforcement actions under the Clean Water Act on behalf of

5    itself and its members.

6           26.    LA Waterkeeper's members live, work, and recreate in and around the Los Angeles

7    basin, including many who live and/or recreate along the Impacted Waters.

8           27.    Members of LA Waterkeeper own homes and reside in Los Angeles County, and use

9    and enjoy the Los Cerritos Channel and the bordering wetlands, parks, pathways, marina and

10   outdoor basketball courts.  LA Waterkeeper members also use and enjoy the Los Cerritos Channel to

11   bike, bird watch, view wildlife, hike, walk, and run. Additionally, LA Waterkeeper members use the

12   Los Cerritos Channel to engage in scientific study through pollution and habitat monitoring and

13   restoration activities.

14          28.    Defendant's discharge of storm water containing pollutants impairs each of those

15   uses.  Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to

16   be adversely affected by Defendant's failure to comply with the Clean Water Act and the General

17   Permit.

18          29.    The relief sought herein will redress the harms to Plaintiff caused by Defendant's

19   activities.

20          30.    Defendant AltAir Paramount, LLC is a limited liability company organized under the

21   laws of Delaware. AltAir Paramount, LLC is a wholly owned subsidiary of World Energy LLC.

22          31.    Plaintiff is informed and believes, and thereupon alleges that Defendant owns and/or

23   operates the Facility, and is subject to the terms of the General Permit.

24          32.    Defendant is a "person" pursuant to the Act.  33 U.S.C. § 1362(5).

25          33.    Continuing commission of the acts and omissions alleged above will irreparably harm

26   Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or

27   adequate remedy at law.

28   //

Amended Complaint for Declaratory and          5          Case No. 2:23-cv-05585-GW-PD
Injunctive Relief and Civil Penalties

## IV. LEGAL BACKGROUND

### A. Clean Water Act

34.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

35.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

36.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

37.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

38.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters.  40 C.F.R. § 230.3 (2015).

39.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

40.     Section 505(a)(1) provides for citizen enforcement actions against any "person,"

including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

41.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B.     California's General Industrial Storm Water Permit**

42.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

43.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

44.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997 and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

46.     Once regulated by an NPDES permit, facilities must strictly comply with all of the

terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

47.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

48.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

49.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

50.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

51.     On July 1, 2020, the amendment to the General Permit by Order No. 2015-0122-DWQ became enforceable and updated pollutant-discharge standards including Total TMDL Implementation Requirements and Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use. General Permit Attachment E.

52.     Any exceedances of a Numeric Effluent Limitation ("NEL") following July 1, 2020 is a

per se violation of the General Permit and Clean Water Act.

53.     For Defendant, applicable NELs include copper (0.0098 mg/L), zinc (0.0956 mg/l), and lead (0.0558 mg/L).  In recent reporting years, and also following the implementation of the NEL for the Los Cerritos Channel, Defendant violated these standards, and LA Waterkeeper alleges that Defendant will continue to exceed NELs in the future.

54.     The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which are pollutant concentration values for industrial storm water discharges ("U.S. EPA Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective September 29, 2021.

55.     U.S. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a permittee facility achieve the statutory BAT/BCT standards. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

56.     The discharge of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc. ("Kramer")*, 619 F. Supp. 2nd 914, 921-25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

57.     The following benchmarks have been established, effective September 29, 2021, for pollutants discharged by Defendant: ammonia – 2.14 mg/L; Total Suspended Solids – 100 mg/L; pH – 6.0-9.0 s.u.; copper – 0.0519 mg/L[1]; lead – 0.082 mg/L; chemical oxygen demand – 120 mg/L; biochemical oxygen demand (5-day) – 30 mg/L; and zinc – 0.12 mg/L.

58.     The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v.*

---

[1] For discharges before September 29, 2021, the EPA benchmark for copper was 0.014 mg/L.

*Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015).

59.     CTR establishes numeric receiving water limits for toxics pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for at least some of the pollutants thought to be discharged by AltAir: zinc – 0.12 mg/L (maximum concentration); copper – 0.013 mg/L (maximum concentration); and lead – 0.065 mg/L (maximum concentration).

60.     The Water Quality Control Plan for the Los Angeles Region ("Basin Plan") sets forth water quality standards and prohibitions applicable to AltAir's storm water discharges from its Facility. The Basin Plan includes a narrative toxicity standard which states that "(a)ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

61.     The Basin Plan's Water Quality Standards require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Cerritos Channel.

62.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

63.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

64.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

65.      Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

66.      Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

67.      The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

68.      The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

69.      Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of

the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicated an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

70.    Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance. General Permit, Section XVI.

**V.    STATEMENT OF FACTS**

**A.  The Facility**

71.    Defendant owns and/or operates the Facility, a renewable fuels production plant that processes animal fats and vegetable oils into transportation fuels, including gasoline, diesel and jet fuel in Paramount, California.

72.    The Facility is operated 24 hours per day, seven days per week.

73.    Defendant conducts industrial activities both indoors and outdoors at the approximately 15-acre Facility.  Industrial activities at the Facility include, but are not limited to: vehicle parking, vehicle and truck roadways, operations related to the tank truck scale house, product oil metering, and operation of an equipment storage yard.

74.    The Facility operates under Standard Industrial Classification ("SIC") Code 2911 ("Petroleum Refining").

75.    Defendant most recently submitted a Notice of Intent to comply with the General Permit for the Facility on or about February 8, 2019.

76.     Plaintiff is informed and believes, and on that basis alleges, that Defendant was enrolled under the General Permit before February 8, 2019, and at least as early as May 8, 2018.

77.     The Facility is assigned the Waste Discharge Identification Number 4 19I027557.

78.     Since at least May 8, 2018, the Facility has operated under General Permit coverage.

79.     Storm water that comes into contact with the refinery process areas is regulated under the Facility's NPDES Permit No. CA0056065, and is required to be discharged, after treatment, into the sanitary sewer system.

80.     The areas of the Facility governed by the General Permit ("GP Area") includes the refinery's North Road and the parking lots located at the western portion of the refinery, as well as the Facility's North Storage Yard and the Scale House Area located at the eastern portion of the refinery.

81.      Defendant collects and discharges storm water associated with industrial activities at the Facility through at least two (2) discharge points.

82.     Plaintiff is informed and believes that fugitive storm water discharges from other border areas at the Facility.

83.     According to the Facility's September 2022 SWPPP, the storm water discharged from the Facility flows to storm drain inlets that discharge to the Los Cerritos Channel.

84.     Storm water discharged from the Facility to the storm water sewer flows southward through county sewers 1106 and 10401 located under Downey Avenue and Somerset Boulevard which flow into the Los Cerritos Channel.

85.     From Los Cerritos Channel, storm water carrying pollutants discharged from the Facility flows into Marine Stadium and Long Beach Marina before reaching Long Beach Outer Harbor and the Pacific Ocean.

86.     Los Cerritos Channel is a water of the United States.

87.     Marine Stadium is a water of the United States.

88.     Long Beach Marina is a water of the United States.

89.     Long Beach Outer Harbor is a water of the United States.

90.     The Pacific Ocean is a water of the United States.

91.     Defendant discharges storm water containing pollutants, including zinc, compounds

increasing chemical and biochemical oxygen demand, copper, solids, sediment, lead, and compounds increasing and decreasing pH, from the Facility during every significant rain event.

92.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 13, 2018 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

93.     The storm water samples collected by Defendant at the Facility's sampling point S-2 on January 6, 2019 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

94.     The storm water samples collected by Defendant at the Facility's sampling point S-2 on January 31, 2019 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

95.     The storm water samples collected by Defendant at the Facility's sampling point S-2 on November 28, 2019 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

96.     The storm water samples collected by Defendant at the Facility's sampling point S-2 on December 28, 2020 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

97.     The storm water samples collected by Defendant at the Facility's sampling point S-2 on March 3, 2021 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

98.     The storm water samples collected by Defendant at the Facility's sampling point S-2 on March 10, 2021 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

99.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 25, 2021 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

100.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 14, 2021 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

101.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 28, 2022 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

102.     The storm water samples collected by Defendant at the Facility's sampling point S-1 on January 5, 2023 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

103.    The storm water samples collected by Defendant at the Facility's sampling point S-1 on March 21, 2023 contained zinc concentrations in excess of the U.S. EPA Benchmark for zinc.

104.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 13, 2018 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

105.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 29, 2018 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

106.    The storm water sample collected by Defendant at the Facility's sampling point S-2 on January 6, 2019 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

107.    The storm water sample collected by Defendant at the Facility's sampling point S-2 on January 31, 2019 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

108.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 28, 2019 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

109.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 12, 2020 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

110.    The storm water sample collected by Defendant at the Facility's sampling point S-2 on April 6, 2020 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

111.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 28, 2020 contained chemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for chemical oxygen demand.

112.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 28, 2021 contained chemical oxygen demand concentrations in excess of the U.S.

1   EPA Benchmark for chemical oxygen demand.

2        113.   The storm water samples collected by Defendant at the Facility's sampling points S-1

3   and S-2 on March 3, 2021 contained chemical oxygen demand concentrations in excess of the U.S. EPA

4   Benchmark for chemical oxygen demand.

5        114.   The storm water sample collected by Defendant at the Facility's sampling point S-2

6   on March 10, 2021 contained chemical oxygen demand concentrations in excess of the U.S. EPA

7   Benchmark for chemical oxygen demand.

8        115.   The storm water samples collected by Defendant at the Facility's sampling points S-1

9   and S-2 on October 25, 2021 contained chemical oxygen demand concentrations in excess of the U.S.

10   EPA Benchmark for chemical oxygen demand.

11        116.   The storm water samples collected by Defendant at the Facility's sampling points S-1

12   and S-2 on March 28, 2022 contained chemical oxygen demand concentrations in excess of the U.S.

13   EPA Benchmark for chemical oxygen demand.

14        117.   The storm water sample collected by Defendant at the Facility's sampling point S-1

15   on January 5, 2023 contained chemical oxygen demand concentrations in excess of the U.S. EPA

16   Benchmark for chemical oxygen demand.

17        118.   The storm water sample collected by Defendant at the Facility's sampling point S-1

18   on March 21, 2023 contained chemical oxygen demand concentrations in excess of the U.S. EPA

19   Benchmark for chemical oxygen demand.

20        119.   The storm water samples collected by Defendant at the Facility's sampling points S-1

21   and S-2 on October 13, 2018 contained copper concentrations in excess of the U.S. EPA Benchmark for

22   copper.

23        120.   The storm water samples collected by Defendant at the Facility's sampling points S-1

24   and S-2 on November 29, 2018 contained copper concentrations in excess of the U.S. EPA Benchmark

25   for copper.

26        121.   The storm water samples collected by Defendant at the Facility's sampling points S-1

27   and S-2 on January 6, 2019 contained copper concentrations in excess of the U.S. EPA Benchmark for

28   copper.

122.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 31, 2019 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

123.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 28, 2019 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

124.     The storm water sample collected by Defendant at the Facility's sampling point S-1 on December 23, 2019 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

125.     The storm water sample collected by Defendant at the Facility's sampling point S-2 on December 25, 2019 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

126.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 12, 2020 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

127.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 22, 2020 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

128.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on April 6, 2020 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

129.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 28, 2020 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

130.     The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 28, 2021 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

131.     The storm water samples collected by Defendant at the Facility's sampling points S-1

and S-2 on March 3, 2021 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

132.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 10, 2021 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

133.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 25, 2021 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

134.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 14, 2021 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

135.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 23, 2021 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

136.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 28, 2022 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

137.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on January 5, 2023 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

138.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 21, 2023 contained copper concentrations in excess of the U.S. EPA Benchmark for copper.

139.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 13, 2018 contained biochemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for biochemical oxygen demand.

140.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on December 28, 2020 contained biochemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for biochemical oxygen demand.

141.    The storm water samples collected by Defendant at the Facility's sampling points S-1

and S-2 on March 3, 2021 contained biochemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for biochemical oxygen demand.

142.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 10, 2021 contained biochemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for biochemical oxygen demand.

143.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on October 25, 2021 contained biochemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for biochemical oxygen demand.

144.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 28, 2022 contained biochemical oxygen demand concentrations in excess of the U.S. EPA Benchmark for biochemical oxygen demand.

145.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 29, 2018 contained total suspended solids concentrations in excess of the U.S. EPA Benchmark for total suspended solids.

146.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 31, 2019 contained total suspended solids concentrations in excess of the U.S. EPA Benchmark for total suspended solids.

147.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 28, 2019 contained total suspended solids concentrations in excess of the U.S. EPA Benchmark for total suspended solids.

148.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on December 23, 2019 contained total suspended solids concentrations in excess of the U.S. EPA Benchmark for total suspended solids.

149.    The storm water sample collected by Defendant at the Facility's sampling point S-2 on April 6, 2020 contained total suspended solids concentrations in excess of the U.S. EPA Benchmark for total suspended solids.

150.    The storm water sample collected by Defendant at the Facility's sampling point S-2 on December 28, 2020 contained total suspended solids concentrations in excess of the U.S. EPA

1   Benchmark for total suspended solids.

2        151.    The storm water sample collected by Defendant at the Facility's sampling point S-2

3   on January 28, 2021 contained total suspended solids concentrations in excess of the U.S. EPA

4   Benchmark for total suspended solids.

5        152.    The storm water sample collected by Defendant at the Facility's sampling point S-2

6   on March 3, 2021 contained total suspended solids concentrations in excess of the U.S. EPA

7   Benchmark for total suspended solids.

8        153.    The storm water samples collected by Defendant at the Facility's sampling points S-1

9   and S-2 on March 10, 2021 contained total suspended solids concentrations in excess of the U.S. EPA

10   Benchmark for total suspended solids.

11        154.    The storm water sample collected by Defendant at the Facility's sampling point S-2

12   on October 25, 2021 contained total suspended solids concentrations in excess of the U.S. EPA

13   Benchmark for total suspended solids.

14        155.    The storm water sample collected by Defendant at the Facility's sampling point S-1

15   on March 28, 2022 contained total suspended solids concentrations in excess of the U.S. EPA

16   Benchmark for total suspended solids.

17        156.    The storm water sample collected by Defendant at the Facility's sampling point S-1

18   on January 5, 2023 contained total suspended solids concentrations in excess of the U.S. EPA

19   Benchmark for total suspended solids.

20        157.    The storm water sample collected by Defendant at the Facility's sampling point S-1

21   on March 21, 2023 contained total suspended solids concentrations in excess of the U.S. EPA

22   Benchmark for total suspended solids.

23        158.    The storm water sample collected by Defendant at the Facility's sampling point S-2

24   on December 28, 2020 contained lead concentrations in excess of the U.S. EPA Benchmark for lead.

25        159.    The storm water samples collected by Defendant at the Facility's sampling points S-1

26   and S-2 on November 28, 2019 contained pH below the U.S. EPA Benchmark for pH.

27        160.    The storm water sample collected by Defendant at the Facility's sampling point S-1

28   on December 23, 2019 contained pH below the U.S. EPA Benchmark for pH.

161.    The storm water sample collected by Defendant at the Facility's sampling point S-1 on December 25, 2019 contained pH below the U.S. EPA Benchmark for pH.

162.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 12, 2020 contained pH below the U.S. EPA Benchmark for pH.

163.    A true and accurate summary of the data (as reported by Defendant to the State Board via the SMARTS database) that are the basis for the allegations contained in paragraphs 92-162 is contained in Section 3 of the CWA Notice Letter.

164.    Exceedances of the U.S. EPA Benchmarks evidence repeated failures to develop, implement, and/or maintain BMPs for the Facility that achieve BAT/BCT-level pollutant reductions.

165.    Failures to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant reductions are violations of the General Permit's technology-based effluent limitations and the Act.

166.    The California Toxics Rule limits are the water quality-based effluent limitations applicable to the Facility's storm water discharges for the period prior to July 1, 2020.

167.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 13, 2018 contained zinc concentrations in excess of the California Toxics Rule limit for zinc.

168.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 29, 2018 contained zinc concentrations in excess of the California Toxics Rule limit for zinc.

169.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 6, 2019 contained zinc concentrations in excess of the California Toxics Rule limit for zinc.

170.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 31, 2019 contained zinc concentrations in excess of the California Toxics Rule limit for zinc.

171.    The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on November 28, 2019 contained zinc concentrations in excess of the California Toxics

1  Rule limit for zinc.

2      172.    The storm water sample collected by Defendant at the Facility's sampling point S-1

3  on December 23, 2019 contained zinc concentrations in excess of the California Toxics Rule limit

4  for zinc.

5      173.    The storm water sample collected by Defendant at the Facility's sampling point S-2

6  on December 25, 2019 contained zinc concentrations in excess of the California Toxics Rule limit

7  for zinc.

8      174.    The storm water sample collected by Defendant at the Facility's sampling point S-1

9  on March 12, 2020 contained zinc concentrations in excess of the California Toxics Rule limit for

10  zinc.

11      175.    The storm water samples collected by Defendant at the Facility's sampling points S-1

12  and S-2 on March 22, 2020 contained zinc concentrations in excess of the California Toxics Rule

13  limit for zinc.

14      176.    The storm water sample collected by Defendant at the Facility's sampling point S-2

15  on April 6, 2020 contained zinc concentrations in excess of the California Toxics Rule limit for zinc.

16      177.    The storm water samples collected by Defendant at the Facility's sampling points S-1

17  and S-2 on October 13, 2018 contained copper concentrations in excess of the California Toxics

18  Rule limit for copper.

19      178.    The storm water samples collected by Defendant at the Facility's sampling points S-1

20  and S-2 on November 29, 2018 contained copper concentrations in excess of the California Toxics

21  Rule limit for copper.

22      179.    The storm water samples collected by Defendant at the Facility's sampling points S-1

23  and S-2 on January 6, 2019 contained copper concentrations in excess of the California Toxics Rule

24  limit for copper.

25      180.    The storm water samples collected by Defendant at the Facility's sampling points S-1

26  and S-2 on January 31, 2019 contained copper concentrations in excess of the California Toxics

27  Rule limit for copper.

28      181.    The storm water samples collected by Defendant at the Facility's sampling points S-1

and S-2 on November 28, 2019 contained copper concentrations in excess of the California Toxics Rule limit for copper.

182.   The storm water sample collected by Defendant at the Facility's sampling point S-2 on December 25, 2019 contained copper concentrations in excess of the California Toxics Rule limit for copper.

183.   The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 12, 2020 contained copper concentrations in excess of the California Toxics Rule limit for copper.

184.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on April 6, 2020 contained copper concentrations in excess of the California Toxics Rule limit for copper.

185.   The true and accurate summary of the data (as reported by Defendant to the State Board via the SMARTS database) that are the basis for the allegations contained in paragraphs 167-184 is contained in Section 3 of the CWA Notice Letter.

186.   Storm water discharges containing pollutant concentrations exceeding California Toxics Rule limits to an impaired receiving water contribute to exceedances of applicable water quality standards for the impairing pollutants.

187.   Storm water discharges from the Facility contain concentrations of zinc exceeding California Toxic rule limits.

188.   Storm water discharges from the Facility contain concentrations of copper exceeding California Toxic rule limits.

189.   Storm water discharges from the Facility contain concentrations of lead exceeding California Toxic rule limits.

190.   Storm water discharges from the Facility contribute to the exceedance of applicable water quality standards for the Los Cerritos Channel.

191.   Storm water discharges from the Facility contributing to an exceedance of the California Toxics Rule prior to the effective date of the NELs on July 1, 2020 are violations of the General Permit's water quality-based effluent limitations and the Act.  General Permit, § VI.A.

192.   Since July 1, 2020, the NELs became the water quality-based effluent limitations applicable to the Facility's storm water discharges.

193.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 28, 2020 contained zinc concentrations in excess of the NEL for zinc.

194.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 28, 2021 contained zinc concentrations in excess of the NEL for zinc.

195.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 3, 2021 contained zinc concentrations in excess of the NEL for zinc.

196.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 10, 2021 contained zinc concentrations in excess of the NEL for zinc.

197.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 25, 2021 contained zinc concentrations in excess of the NEL for zinc.

198.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 14, 2021 contained zinc concentrations in excess of the NEL for zinc.

199.   The storm water sample collected by Defendant at the Facility's sampling point S-2 on December 23, 2021 contained zinc concentrations in excess of the NEL for zinc.

200.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 28, 2022 contained zinc concentrations in excess of NEL for zinc.

201.   The storm water sample collected by Defendant at the Facility's sampling point S-1 on January 5, 2023 contained zinc concentrations in excess of the NEL for zinc.

202.   The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 21, 2023 contained zinc concentrations in excess of the NEL for zinc.

203.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 28, 2020 contained copper concentrations in excess of the NEL for copper.

204.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on January 28, 2021 contained copper concentrations in excess of the NEL for copper.

205.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 3, 2021 contained copper concentrations in excess of NEL for copper.

206.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 10, 2021 contained copper concentrations in excess of the NEL for copper.

207.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on October 25, 2021 contained copper concentrations in excess of the NEL for copper.

208.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 14, 2021 contained copper concentrations in excess of the NEL for copper.

209.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on December 23, 2021 contained copper concentrations in excess of the NEL for copper.

210.   The storm water samples collected by Defendant at the Facility's sampling points S-1 and S-2 on March 28, 2022 contained copper concentrations in excess of the NEL for copper.

211.   The storm water sample collected by Defendant at the Facility's sampling point S-1 on January 5, 2023 contained copper concentrations in excess of the NEL for copper.

212.   The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 21, 2023 contained copper concentrations in excess of the NEL for copper.

213.   The storm water sample collected by Defendant at the Facility's sampling point S-2 on December 28, 2020 contained lead concentrations in excess of the NEL for lead.

214.   The storm water sample collected by Defendant at the Facility's sampling point S-1 on March 21, 2023 contained lead concentrations in excess of the NEL for lead.

215.   The true and accurate summary of the data (as reported by Defendant to the State Board via the SMARTS database) that are the basis for the allegations contained in paragraphs 193-214 is contained in Section 3 of the CWA Notice Letter.

216.   Storm water discharges containing zinc concentrations exceeding the General Permit's NEL for zinc are violations of the General Permit and the Act.

217.   Storm water discharges containing copper concentrations exceeding the General Permit's NEL for copper are violations of the General Permit and the Act.

218.   Storm water discharges containing lead concentrations exceeding the General Permit's NEL for lead are violations of the General Permit and the Act.

219.   Each industrial process undertaken by Defendant at the Facility represents a pollutant

source that, pursuant to the General Permit, must be disclosed, assessed, and controlled to prevent or limit pollutant concentrations in storm water discharges.  General Permit, § X.G.1-2.

220.     Some of the Facility's industrial activities generate dust and particulates.

221.     The 2022 SWPPP does not contain a description of each industrial activity undertaken at the Facility that generates dust and particulates.

222.     The 2022 SWPPP does not contain an assessment of each industrial activity undertaken at the Facility that generates dust and particulates.

223.     Plaintiff is informed and believes, and thereupon alleges, that Defendant have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

224.     Defendant's SWPPPs do not include a compliant site map, adequate pollutant source descriptions or assessments, adequate BMPs or descriptions of BMPs.

225.     The discharge of storm water from the Facility containing pollutant concentrations exceeding U.S. EPA Benchmarks, California Toxics Rule limits, and NELs evidence a failure to develop, implement, and revise a lawful SWPPP.

226.     Defendant has conducted and continues to conduct industrial activities at the Facility without developing, implementing, or revising a compliant Monitoring Plan.

227.     Defendant has failed to conduct required sampling and analysis of Qualified Storm Events, and failed to analyze samples collected for all required pollutants.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Defendant's Discharges of Contaminated Storm Water from the Facility
in Violation of the General Permit's Numeric Effluent Limitations and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

228.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

229.     Since at least July 1, 2020, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants exceeding the Numeric Effluent Limitations for zinc. General Permit, Attachment E.

230.     Since at least July 1, 2020, Defendant has discharged contaminated storm water from

1    the Facility containing levels of pollutants exceeding the Numeric Effluent Limitations for copper.

2    General Permit, Attachment E.

3         231.    Since at least July 1, 2020, Defendant has discharged contaminated storm water from

4    the Facility containing levels of pollutants exceeding the Numeric Effluent Limitations for lead.

5    General Permit, Attachment E.

6         232.    Plaintiff is informed and believes, and thereon alleges, that discharges of storm water

7    containing levels of pollutants exceeding the Numeric Effluent Limitations for copper, lead, and zinc

8    occur each time storm water discharges, or has discharged, from the Facility.

9         233.    Defendant's violations of the General Permit's Numeric Effluent Limitations are

10   ongoing and continuous.

11        234.    Each and every violation of any of the General Permit's Numeric Effluent

12   Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

13        235.    Every day, since at least July 1, 2020, that Defendant has discharged polluted storm

14   water from the Facility in violation of the General Permit's Numeric Effluent Limitations is a

15   separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

16        236.    Defendant is subject to an assessment of civil penalties for each and every violation

17   of the General Permit and Act occurring from July 1, 2020 to the present, pursuant to sections

18   309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

19        237.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. §

20   1365(a).  Continuing commission of the actions and omissions alleged above would irreparably

21   harm LA Waterkeeper and the residents of the State of California, for which there is no plain,

22   speedy, or adequate remedy at law.

23        238.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

24   actual controversy exists as to the rights and other legal relations of the Parties.

25             WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

26   //

27   //

28   //

**SECOND CLAIM FOR RELIEF**
**Defendant's Discharges of Contaminated Storm Water from the Facility**
**in Violation of the General Permit's Receiving Water Limitations and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

239.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

240.    Since at least May 8, 2018, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards in violation of the General Permit's water quality-based effluent limitations. General Permit, § VI.A.

241.    Since at least May 8, 2018, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that adversely impact human health and the environment in violation of the General Permit's water quality-based effluent limitations.  General Permit, § VI. B.

242.    Since at least May 8, 2018, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that threaten to cause pollution or a public nuisance in violation of the General Permit's water quality-based effluent limitations.  General Permit, § VI. C.

243.    LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance from the Facility occur each time storm water is discharged, and was discharged, from the Facility.

244.    Defendant's violations of the General Permit's Receiving Water Limitations are ongoing and continuous.

245.    Each and every violation of any of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

246.    Every day, since at least July 1, 2020, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

247.   Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 8, 2018 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

248.   An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

249.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

### THIRD CLAIM FOR RELIEF
**Defendant's Failure to Prepare, Implement, Review, and
Update a Compliant Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

250.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

251.   Defendant has failed to develop and implement an adequate SWPPP for the Facility.

252.   Defendant has further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit. General Permit, Sections X.B.1 and X.C.1.b.  Defendant continues to be in violation of the Act each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

253.   Defendant's violations of the General Permit's SWPPP requirements are ongoing and continuous.

254.   Each day since May 8, 2018 that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

255.   Defendant has been in violation of the General Permit's SWPPP requirements every day since May 8, 2018.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

256.    Defendant is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 8, 2018 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

257.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

258.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

### FOURTH CLAIM FOR RELIEF
**Failure to Develop and Implement the Best Available
And Best Conventional Treatment Technologies at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

259.    LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

260.    Defendant has failed, and continues to fail, to reduce or prevent pollutants associated with their industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT treatment standards.

261.    Defendant discharges storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

262.    Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

263.    Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

264.    Each and every violation of the General Permit's technology-based effluent

1    limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

2        265.   Defendant's violations of the General Permit's technology-based effluent limitations

3    and the Act are ongoing and continuous.

4        266.   Defendant is subject to an assessment of civil penalties for each and every violation

5    of the General Permit and Act occurring from May 8, 2018 to the present, pursuant to sections

6    309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

7        267.   An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. §

8    1365(a).  Continuing commission of the actions and omissions alleged above would irreparably

9    harm LA Waterkeeper and the residents of the State of California, for which there is no plain,

10   speedy, or adequate remedy at law.

11       268.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

12   actual controversy exists as to the rights and other legal relations of the Parties.

13       WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

14

15                          **FOURTH CLAIM FOR RELIEF**
                      **Failure to Implement an Adequate**
16              **Monitoring Implementation Plan for the Facility**
          **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

17       269.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set

18   forth herein.

19       270.   Defendant has failed to develop and implement a legally adequate monitoring and

20   reporting program for the Facility.

21       271.   Defendant's violations of the General Permit's Monitoring Plan requirements and the

22   Act are ongoing and continuous.

23       272.   Defendant is subject to an assessment of civil penalties for each and every violation

24   of the General Permit and Act occurring from May 8, 2018 to the present, pursuant to sections

25   309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

26       273.   An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. §

27   1365(a).  Continuing commission of the actions and omissions alleged above would irreparably

28   harm LA Waterkeeper and the residents of the State of California, for which there is no plain,

1   speedy, or adequate remedy at law.

2       274.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

3   actual controversy exists as to the rights and other legal relations of the Parties.

4       WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

5   **VII.**    **RELIEF REQUESTED**

6       Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

7       a.   Declare Defendant to have violated and to be in violation of the General Permit

8   and the Clean Water Act as alleged herein;

9       b.   Enjoin Defendant from discharging polluted storm water from the Facility except

10  as authorized by the General Permit;

11      c.   Enjoin Defendant from further violating the substantive and procedural

12  requirements of the General Permit;

13      d.   Order Defendant to immediately implement storm water pollution control

14  technologies and measures that satisfy BAT and BCT and that prevent pollutants in the Facility's

15  storm water from contributing to violations of any water quality standards;

16      e.   Order Defendant to comply with the General Permit's monitoring and reporting

17  requirements, including ordering supplemental monitoring to compensate for past monitoring

18  violations;

19      f.   Order Defendant to prepare a SWPPP consistent with the General Permit's

20  requirements and implement procedures to regularly review and update the SWPPP;

21      g.   Order Defendant to pay civil penalties of $64,618 per day per violation for all

22  violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33

23  U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

24      h.   Order Defendant to take appropriate actions to restore the quality of navigable

25  waters impaired or adversely affected by its activities;

26      i.   Award Plaintiff's costs and fees (including reasonable investigative, attorney,

27  witness, compliance oversight and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d);

28  and,

1          j.   Award any such other and further relief as this Court may deem appropriate.

2   Dated: July 21, 2023              Respectfully Submitted,

3                              LAW OFFICES OF ANDREW L. PACKARD

4

5                     By:    /s/ William N. Carlon

6                              William N. Carlon
                                  Attorneys for Plaintiff

7                              LOS ANGELES WATERKEEPER